**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BIMBO BAKERIES USA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,<br><br>Defendant. | Case No. 24-cv-02970<br><br>Judge John Robert Blakey |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Bimbo Bakeries USA, Inc. sued Central States, Southeast and Southwest Areas Pension Fund ("the Fund") under the Declaratory Judgment Act, ERISA, and the Labor Management Relations Act ("LMRA"), seeking a declaration concerning the amount of contributions it must pay the Fund under certain collective bargaining agreements ("CBAs"). Plaintiff claims that it negotiated CBAs with various Teamsters Local Unions that included a "Contribution Rate Freeze Provision," that the Fund approved those agreements, and then later reneged on that approval, advising Plaintiff that it would disregard the Contribution Rate Freeze Provision in 24 previously approved CBAs. [1]. The parties cross-moved for summary judgment. [33], [39]. For the reasons explained below, we grant Defendant's motion [33] and deny Plaintiff's motion [39].

## I. Background[1]

The material facts in this case are largely uncontested. Defendant Central States, Southeast and Southwest Areas Pension Fund is a multiemployer pension plan, meaning multiple employers contribute and the plan is maintained pursuant to CBAs between employers and employee organizations such as unions. *See* 29 U.S.C. §§ 1002(37), 1301(a)(3). The Fund has thousands of contributing employers and tens of thousands of active participants. [37] ¶ 5. It is administered by a Board of Trustees (the "Trustees") composed of an equal number of representatives appointed by employers and unions. *Id.* ¶ 3. Plaintiff Bimbo Bakeries USA, Inc., a commercial baking company with tens-of-thousands of employees, has been a member of the Fund for decades. [41] ¶¶ 1, 4.

To participate in a multiemployer pension plan, employers and unions must generally enter into collective bargaining agreements ("CBAs") that require the employer to make financial contributions to the plan at an agreed-upon rate. [37] ¶ 8. These payments are used to fund the vested benefits of the plan's participants as well as the plan's administrative costs. *Id.* ¶ 4. For its part, Plaintiff is obligated to contribute to the Fund on behalf of its employees pursuant to CBAs it maintains with local unions affiliated with the International Brotherhood of Teamsters. *Id.* ¶ 7. In participation agreements with these local unions, Plaintiff agreed that its CBAs were "Bound by the Trust Agreement[s] of the Pension Fund … and *all amendments*

[1] The Court draws the following facts from Defendant's Local Rule 56.1 Statement of Undisputed Material Facts and its underlying exhibits, [35], Plaintiff's Responses thereto, [37], and Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts, its underlying exhibits, and Defendant's response thereto, [38], [41].

*subsequently adopted* as well as the rules and regulations presently in effect *or subsequently adopted* by the Trustees of the Fund[]." *Id.* ¶ 9 (emphasis added) (alteration in original).

Under the Employee Retirement Income Security Act of 1974 ("ERISA") as amended by the Pension Protection Act of 2006, multiemployer pension plans that become underfunded are required to comply with a "rehabilitation plan" when the plan's actuary determines that it is in "critical" or "critical and declining status." *See* 29 U.S.C. § 1085. In March 2008, the Fund's actuary determined it was in critical status, triggering the Fund's Board of Trustees to adopt a rehabilitation plan (the "Rehabilitation Plan"). *Id.* ¶ 13–14. Plaintiff opted into a contribution schedule of the Rehabilitation Plan under which it was obligated to submit CBAs with minimum-contribution-rate increases around 4% per year. *Id.* ¶¶ 15, 18.

In the spring of 2021, Plaintiff was negotiating successor CBAs with certain "Local Unions" affiliated with Teamsters. *Id.* ¶ 20. Also around that time, President Biden signed the American Rescue Plan Act of 2021, which created an assistance program through which distressed multiemployer pension plans could apply for and receive federal funds. *Id.* ¶ 19. Anticipating that this federal assistance could help the Fund reach its goals under the Rehabilitation Plan—potentially obviating the need for contribution rate increases—Plaintiff and the Local Unions finalized 24 CBAs containing the following "Contribution Rate Freeze Provision" (or the "Rate Freeze Provision"):

> In the event the Trustees of the Central States Pension Fund (the "Fund") discontinue required pension rate increases for employers

> pursuant to the Fund's Rehabilitation Plan, the contribution rate in effect at the time of the discontinuance will be frozen for the remainder of the term of the Agreement.

*Id.* ¶ 25.

On April 6, 2021, prior to the finalization of the agreements, David Dudas, Teamsters' Bakery Conference Director, sent an email to Michael Mullane, the Fund's Director of Marketing and Field Service Group, asking him to review the Rate Freeze Provision in advance of the Local Unions' ratification of the 2021 CBAs. *Id.* ¶ 23. Mullane responded:

> we're okay with the language. I had the pension language reviewed by [the Fund's Senior Director of Employer Services, Pension and Finance] Pete Priede and since the onus is on our Trustees to modify the Rehabilitation Plan, we're okay with the language. We don't have any issue with that language.

*Id.* ¶¶ 23–24.

On January 12, 2023, the Fund received over $35 billion in Special Financial Assistance provided by the American Rescue Plan Act of 2021. [41] ¶ 38. In April 2023, the Fund's Board of Trustees sent notices to Plaintiff (in addition to other employers) explaining the effect of an amendment to the Rehabilitation Plan, which it had implemented in response to this funding. *Ibid.* The notices explained that as of 2023, after receiving the assistance, the Fund was "approximately 97.5% funded with a highly conservative investment strategy to reach full funding in the coming years." *Ibid*; *see also* [35-1] at 680–81. The Fund therefore "approved a favorable change to Central States Rehabilitation Plan which eliminates mandatory annual contribution rate increases for most bargaining units." [35-1] at 680. The

Amendment, however, did not eliminate contribution rate increases for all existing CBAs right away. Instead, it provided that:

> [A]bsent further amendment to this rehabilitation plan, that for Collective Bargaining Agreements that have a stated expiration date on or after April 3, 2023: Rate increases continue to be required on the regular annual schedule until the stated expiration date of the Collective Bargaining Agreement. … *The annual contribution rate increases are required for the entire term of the Collective Bargaining Agreement even if those contribution rate increases are not specified in the Collective Bargaining Agreement, or if the Collective Bargaining Agreement purports to allow the employer to cease contribution rate increases mid-contract.* … After the stated expiration date of the Collective Bargaining Agreement, annual contribution rate increases will not be required beyond the rate at the stated expiration date unless the bargaining parties agree to a higher rate.

[37] ¶ 26; [35-1] at 661 (emphasis added). Since the at-issue CBAs had an expiration date after April 3, 2023, the notices explained that, for Plaintiff's employees covered by those CBAs, the Fund "shall continue to require annually compounded contribution rate increases pursuant to the Primary [Rehabilitation] Schedule (generally 4%) until the latter of (1) [the existing CBA's expiration date], or (2) the date that Central States receives a fully executed new collective bargaining agreement." [37] ¶ 26; [35-1] at 680. In reference to the Rate Freeze Provision, the Fund clarified that, pursuant to the amendment, "annual contribution rate increases are required for the entire term of the CBA even though [the 2021 CBA] purports to allow the parties to cease contribution rate increases mid-contract." [37] ¶ 27. This precluded the application of that provision in the 24 at-issue CBAs.

Plaintiff submitted a formal written appeal to the Trustees through letters dated June 7, 2023 and July 12, 2023, requesting that it be able to freeze its pension contribution rate at the rate in place within each CBA as of April 3, 2023. *Id.* ¶ 29.

Plaintiff argued that the Contribution Rate Freeze Provision of its CBAs kicked in when the Rehabilitation Plan was amended, since, as Plaintiff viewed it, the Amendment "eliminated future required contribution rate increases." *Id.* ¶ 29; [35-1] at 687–88, 690–91. By requiring payment of the continued rate increases, Plaintiff argued that the Fund disregarded the "clear and unambiguous intent of the parties" expressed in the CBAs. [35-1] at 688, 692. Plaintiff also asserted that the Fund was "equitably estopped" from requiring Plaintiff to continue increasing its contribution rates because "senior Fund officials" did not previously object to the Contribution Rate Freeze Provision when the 2021 CBAs were being negotiated. *See* [35-1] at 688–89, 692–93.

The Trustees rejected the appeal, citing language in the Trust Agreement and Rehabilitation Plan that they believed superseded the language in the CBAs. *Id.* at 695–97. The Trustees also rejected Plaintiff's equitable estoppel argument. *Id.* at 697–99. They therefore "denied Bimbo's request to freeze its pension contribution rate at the contribution rate in place within each CBA as of April 3, 2023." *Id.* at 699.

Plaintiff has since paid contributions to the Fund pursuant to the CBAs at the increasing rates that the Trustees deemed required under the Amended Rehabilitation Plan. [37] ¶ 34. Plaintiff filed this lawsuit seeking a declaratory judgment that the Contribution Rate Freeze Provision is enforceable and should be applied for the duration of the impacted CBAs. It also sought an injunction requiring the Fund to refund contributions Plaintiff made in excess of the rate in effect in each

of the impacted CBAs as of April 3, 2023. [1] ¶¶ 92, 100. Both parties moved for summary judgment. [33], [39].

## II. Applicable Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party bears the burden of demonstrating there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A fact is considered material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

When parties file cross-motions for summary judgment, the filing does not alter the applicable standard or require the court to grant judgment in favor of either party. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Loc. Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003). The court must evaluate each motion independently, as cross-motions do not establish the absence of genuine issues of material fact. *Ibid.* In doing so, the court must view evidence and draw all reasonable inferences in favor of the nonmoving party when considering a motion for summary judgment. *Anderson,* 477 U.S. at 255. In conducting this analysis, the court must not weigh the evidence. *Id.* at 249.

## III. Analysis

### a. Review of the Trustees' Determination

An administrator's determination of an issue in an ERISA plan "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). But "if the plan confers discretionary authority," then the Trustees' determination will "be reviewed under an arbitrary and capricious standard.*" Militello v. Cent. States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 685 (7th Cir. 2004).

The parties rightly agree that the arbitrary and capricious standard of review applies to the Trustees' decision. Article V, § 2 of the Fund's Trust Agreement vests "Trustees with discretionary and final authority in making all decisions" concerning all "questions or controversies, of whatsoever character, arising in any manner or between any parties or persons in connection with the Fund or the operation thereof." [37] ¶ 40. This includes decisions concerning:

> the construction of the language or meaning of the rules and regulations adopted by the Trustees or of this instrument, or as to any writing (*including a collective bargaining agreement* or other Union-Employer agreement in cases where the interpretation is necessary *in order to determine the application of the terms of this Agreement, a Participation Agreement, the Plan or any other Fund document or agreement to the provisions of the collective bargaining agreement* or other Union-Employer agreement).

*Ibid*. (emphasis added). Such discretion-conferring language is sufficient to trigger the arbitrary and capricious standard of review. *See, e.g., Militello*, 360 F.3d at 685–

86 (holding that identical language in a Central States trust agreement triggered the arbitrary and capriciousness standard).

Under this deferential standard, "an administrator's decision will not be overturned if (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass important aspects of the problem." *Id.* at 686 (quoting *Hess v. Hartford Life & Acc. Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)) (internal quotation marks omitted). The Court may "overturn a benefit administrator's decision only if the decision is 'downright unreasonable.'" *Black v. Long Term Disability Ins.*, 582 F.3d 738, 745 (7th Cir. 2009) (quoting *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007)). The Court considers "only the evidence that was before the administrator when it made its decision." *Militello*, 360 F.3d at 686.

Here, the Trustees determined that the Contribution Rate Freeze is unenforceable under Article III, § 1 and Article III, § 7 of the Trust Agreement. *See* [35-1] at 695–96. Under § 1, the Trustees noted that in addition to being required to make contributions pursuant to the language of applicable CBAs, employers had to contribute pursuant to the Fund's "participation agreement," "applicable law," and "all rules and requirements for participation by Employers in the Fund as established and interpreted by the Trustees in accordance with their authority." [37] ¶ 36; [35-1] at 695. And § 7 deems "unenforceable" any "provision contained in … a collective

bargaining agreement … that purports to authorize the elimination of or reduction of the duty to contribute to the Fund before the termination of the collective bargaining agreement." [37] ¶ 38; [35-1] at 696. The Trustees concluded that application of the rate freeze language in the at-issue CBAs would allow Plaintiff to reduce its future obligations under the Rehabilitation Plan, thus violating Article III, § 7. That is, in freezing its contribution rates, Plaintiff would avoid its existing obligation to pay the 4% annual increase. *See* [35-1] at 696.

Plaintiff insists that this reasoning is arbitrary and capricious because the CBA froze the rates *in place*, so the Rate Freeze Provision was not an "elimination" or "reduction." But the amendment to the Rehabilitation Plan never discontinued rate increases for existing CBAs, like Plaintiff's, that had expiration dates after April 3, 2023. Thus, it was reasonable for the Trustees to conclude that by purporting to freeze the rate increases at the time of the amendment, Plaintiff reduced its existing obligation to the Fund. Simply put, application of the Contribution Rate Freeze Provision would allow Plaintiff to pay less than was required of it under the Rehabilitation Plan as of April 2023.

Plaintiff also argues that even if the Trustees were correct (that the rate freeze constituted an elimination or reduction), the Fund waived its right to enforce Article III, § 7 to the at-issue CBAs, because it waited until April 2023 to do so. As Plaintiff tells it, Article IV, § 20 of the Trust Agreement authorizes the Fund to reject a CBA "whenever it determines that the [CBA] is unlawful and/or inconsistent with any rule or requirement for participation by employers in the Fund." [39] at 9. And because

the Fund had not flagged its concerns prior to the April 2023 Amendment, the Fund must have considered the at-issue CBAs to be lawful and consistent with the Fund's rules. Therefore, Plaintiff argues, the Fund effectively waived its ability to enforce Article III, § 7 to the Rate Freeze Provision, which it has the power to do under Article IV, § 21 of the Trust Agreement (which provides a mechanism for waiver). *Ibid.*

Plaintiff, however, did not make this specific argument to the Trustees on appeal, so they did not address it. *See generally* [35-1] at 686–89, 691–93, 695–99. That makes it impossible for this Court to review the Trustees' conclusions for arbitrary and capriciousness on this issue. *Cf. United States v. Robinson*, 165 F.4th 1043, 1055 (7th Cir. 2025) (Easterbrook, J., concurring) (explaining that in the plain error context, it is impossible to determine that a judge plainly erred if the party never asked him to act on an issue). Consequently, the Court deems this argument unexhausted and disregards it. *See Fritcher v. Health Care Service Corp.*, 301 F.3d 811, 815 n.3 (7th Cir. 2002) (noting that the Court has discretion to require administrative exhaustion in ERISA cases).

Furthermore, even if Plaintiff had exhausted its waiver theory, it would not have prevailed. Article IV, § 20 allows the Trustees to reject "any collective bargaining agreement … *whenever* they determine that the agreement is unlawful and/or inconsistent" with the Fund's rules. [35-1] at 31 (emphasis added). The Trustees did so in April 2023 after the Rehabilitation Plan was amended and the disputed language of Plaintiff's CBAs became pertinent. Plaintiff does not point to any language in the Trust Agreement requiring that such a determination come

earlier (e.g., at the time the CBAs were being negotiated). On the contrary, the Trust Agreement explicitly provided the Trustees with temporal flexibility to enforce the Fund's rules. Additionally, Article IV, § 21 of the Trust Agreement grants the Trustees the authority "to waive enforcement/compliance" with the benefits conferred on the Fund "when they determine that the waiver is in the best interests of the Fund." [35-1] at 31. Nevertheless, Plaintiff fails to cite any evidence that the Trustees ever made such a finding. Instead, the fact that the Trustees ultimately barred Plaintiff from applying the Rate Freeze Provision suggests they determined that freezing rate increases in Plaintiff's existing CBAs would *not be* in the Fund's best interest, belying any reasonable suggestion that the Trustees exercised their waiver power under § 21.

Thus, the Trustees' finding that the Contribution Rate Freeze Provision was unenforceable under Article III, § 1 and Article III, § 7 of the Trust Agreement was based on a reasonable explanation of the relevant plan documents. It was not arbitrary and capricious.

In the alternative, the Trustees concluded that even if the Contribution Rate Freeze Provision was enforceable, it was not triggered by the April 2023 Amendment to the Rehabilitation Plan. Recall that the Contribution Rate Freeze Provision would be triggered when "the Trustees of [the Fund] discontinue required pension rate increases for employers pursuant to the Fund's Rehabilitation Plan." [37] ¶ 25. But, the Trustees explained, the Trustees did not discontinue any required pension-rate increases; instead, the Trustees have "continued the increases for the duration of the

Collective Bargaining Agreement not just for Bimbo, but for all employers." [35-1] at 696–97.

Plaintiff takes issue with this reasoning, arguing that it wrongly imposes a nontextual limitation on the provision's triggering event. Instead, Plaintiff's preferred reading is that the freeze provision triggers when the pension-rate increases are discontinued for *any* employer contributing to the Fund. Under Plaintiff's reading, because the Amendment discontinued rate increases for most CBAs without an expiration date after April 2023, this event triggered the freeze provision. The Trustees' contrary reading, however, is equally plausible: the April 2023 amendment to the Rehabilitation Plan made it clear that for all CBAs with expiration dates after April 2023, the scheduled rate increases would continue until the end of the CBA's term. This was true for *all* employers who were a party to such CBAs. It is thus fair to conclude that the Trustees did the opposite of "discontinuing required pension rates for employers pursuant to the Fund's Rehabilitation Plan." In this way, the Amendment expressly maintained the status quo under the Rehabilitation Plan—continuing rate increases—for employers with existing CBAs. Given the relevant language, this Court finds that the Trustees' construction of the CBA's freeze-provision is not "downright unreasonable."

Finally, Plaintiff argues that regardless of the Fund's interpretation of the Rehabilitation Plan and Trust Agreement, the Fund's decision to "now reject the freeze provision amounts to a contract amendment," which is prohibited by 29 U.S.C.

§ 1145.[2] Plaintiff fails to explain, however, which specific provision of the plan's documents the Fund "amended." True, the Fund's interpretation precludes the application of a provision in the 24 CBAs, but Article XIV, § 11 of the Trust Agreement says that each "participating Employer … that contributes to the Fund shall be bound by the provisions of this Agreement." [37] ¶ 48. And "to the extent there is a conflict between [the Trust Agreement] and any provisions of a collective bargaining agreement … [the Trust Agreement] shall control." [37] ¶ 43. As explained above, the Trustees applied the Trust Agreement and reasonably found it in conflict with the Rate Freeze Provision in Plaintiff's CBAs. This constitutes a straightforward application of the terms of the Plaintiff's contract with the Fund, not an amendment.

Based upon the record, this Court holds that the Trustees did not act arbitrarily and capriciously when they determined that Plaintiff had to pay the rate increases required by the April 2023 Rehabilitation Plan Amendment. The Trustees' determination that the Contribution Rate Freeze was unenforceable under the Trust Agreement and Rehabilitation plan, and their alternative determination that the Contribution Rate Freeze Provision was not triggered, were reasonable.

**b. Equitable Estoppel**

Plaintiff argues that even if the Trustees' decision was not arbitrary and capricious, the Fund should be estopped from requiring Plaintiff to pay increasing

[2] That Statute reads, "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."

contribution rates under the 24 CBAs. This Court notes that the Seventh Circuit has "not decided whether estoppel claims should be available in ERISA actions involving multi-employer, funded plans." *Cent. States, Se. & Sw. Areas Pension Fund v. Kroger Co.*, 226 F.3d 903, 914–15 (7th Cir. 2000); *see also Pearson v. Voith Paper Rolls, Inc.*, 656 F.3d 504, 508 (7th Cir. 2011) (declining to resolve whether an estoppel claim against a defined-benefit, funded pension plan is legally cognizable). As other judges in this district have done, the Court sets aside this uncertainty and assumes that equitable estoppel remains available as a theory of recovery. *See, e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. Oudenhoven Constr., Inc.*, 639 F. Supp. 3d 780, 785 (N.D. Ill. 2022); *Crowell v. Bank of Am. Pension Plan for Legacy Cos.*, 2011 WL 856650, at *5–8 (N.D. Ill. Mar. 9, 2011).

Unlike the Trustees' interpretation of the Fund's governing documents, this Court reviews Plaintiff's estoppel theory de novo since estoppel is a principle of equity, which is to be applied by the courts "to achieve fairness and avoid injustice." *Jennings Water, Inc. v. City of North Vernon*, 895 F.2d 311, 316 (7th Cir. 1989); *see also CIGNA Corp. v. Amara*, 563 U.S. 421, 443 (2011); *Crowell*, 2011 WL 856650, at *4. In construing plans under ERISA, federal courts apply "'ordinary' or 'general' principles of contract law" rather than forum state law. *Kim v. Jump Trading*, 186 F.4th 909, 916 (7th Cir. 2026) (citing *M&G Polymers v. Tackett*, 574 U.S. 427, 435 (2015)). For suits related to employer-funded pension plans, the Seventh Circuit has explained that statements or conduct by individuals may estop the enforcement of a plan's written terms "only in extreme circumstances." *Pearson*, 656 F.3d at 509. A

plaintiff "demonstrating extreme circumstances must also show (1) a knowing misrepresentation; (2) made in writing; (3) reasonable reliance on that misrepresentation by the plaintiff; and (4) that the reliance was to the plaintiff's detriment." *Ibid.*

Plaintiff contends that the Fund made a knowing misrepresentation after the Fund's Director of Marketing and Field Service Group, Michael Mullane, told a Teamster's representative in 2021 that the Fund was "okay with the language" in the draft CBAs containing the Rate Freeze Provision. *See* [37] at 23. Plaintiff fails to explain, however, how this single statement from the Fund's Marketing Director to a different party constitutes the "extreme circumstances" that would warrant estopping the Fund from enforcing the Plan's terms against Plaintiff two-years later. In short, the facts do not support the use of estoppel.

Indeed, contrary to Plaintiff's theory, the record fails to show that Mullane's statement was a knowing misrepresentation, rather than, at the very worst, an ordinary mistake. *Pearson*, 656 F.3d at 509 ("Negligence is not sufficient to meet the standard for a knowing misrepresentation" nor are "inadvertent mistakes," "clerical errors," or "bureaucratic sloppiness.") (citing cases). Here, to the extent Mullane's email may have incorrectly described the Trustees' views on the future applicability of the Rate Freeze Provision, the record shows no more than "bureaucratic sloppiness." Recall that the Trustees determined that the Contribution Rate Freeze Provision could not be applied because it was (a) unenforceable after the 2023 Rehabilitation Plan Amendment; and (b) it was not triggered by the Amendment even

if it *was* enforceable. Both conclusions were a product of the language in the Trust Agreement and the terms of the Amended 2023 Rehabilitation Plan. Thus, Mullane's 2021 statement made no representation—let alone an intentionally false one—about how a future change to the Rehabilitation Plan might affect the applicability of the Rate Freeze Provision, the fundamental issue the Trustees decided in Plaintiff's appeal. Indeed, Mullane's email warns, or at least indicates, that a future modification to the Rehabilitation Plan *would* affect the application of the Rate Freeze Provision. As he told the Teamsters representative, "since *the onus is on our Trustees to modify the Rehabilitation Plan*, we're okay with the language. We don't have any issue with that language." [37] at 23 (emphasis added). Quite simply, Mullane made no representation as to how the language would later be interpreted and applied. He simply stated that he and the Fund official referenced in his email did not have an issue facially with the CBA's language in 2021. This communicated nothing about how the *Trustees*—who had the final say—would eventually interpret the Rate Freeze Provision when it was (or wasn't) triggered come April 2023.

Regardless, even if Mullane's statement could be construed as a knowing misrepresentation of the Trustees' future determination (it cannot), Plaintiff's reliance upon it remains unreasonable. As noted above, Article V, § 2 of the Trust Agreement (which Plaintiff signed prior to 2021) grants the Trustees final authority in all decisions concerning the application of rules and regulations to the CBAs. Mullane did not purport to speak for the Trustees in his email. In fact, he did the opposite by emphasizing their final authority to modify the Rehabilitation Plan. It

was therefore unreasonable for Plaintiff to rely on his statements as a stand-in for the Trustees' views when the Plan was amended two-years later. No reasonable factfinder could conclude that, in April 2023, the Fund was estopped from requiring Plaintiff to pay the rate increases called for by the relevant schedule in the Amended Rehabilitation Plan.

## IV. Conclusion

For the reasons explained above, no reasonable factfinder could conclude that the Trustees' decision was arbitrary and capricious, nor that the Fund is estopped from enforcing its determination concerning the Rate Freeze Provision. The Court therefore denies Plaintiff's motion for summary judgment [39] and grants Defendant's motion for summary judgment [33]. The Clerk shall enter judgment for Defendant and against Plaintiff. All dates and deadlines are stricken. Civil case terminated. In its motion, the Fund claims an entitlement to fees under the Trust Agreement; to the extent attorneys' fees are at issue, the parties shall comply with L.R. 54.3.

Dated: November 23, 2026 Entered:

John Robert Blakey
United States District Judge